## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TERRELL D. HARGRAVES,

        Plaintiff,

        v.

DISTRICT OF COLUMBIA, *et al.*,

        Defendants.

Civil Action No. 12-1459 (BAH)
Judge Beryl A. Howell

### MEMORANDUM OPINION

The plaintiff, Terrell D. Hargraves, filed this lawsuit against the District of Columbia and two D.C. Metropolitan Police Department ("MPD") Officers Kevin Lally and Sean Connors, alleging that, on September 30, 2011, the plaintiff sustained a "brutal" beating and wrongful arrest by the two defendant officers, in violation of the plaintiff's Fourth Amendment and Fifth Amendment rights, under 42 U.S.C. § 1983. *See* Am. Compl. ¶¶ 6–7, 53–66 (Count III), ECF No. 8.[1] The Amended Complaint also claims, in six additional counts, that the defendants committed multiple common-law torts, including battery, intentional infliction of emotional distress, negligence and negligent supervision, negligent infliction of emotional distress, false imprisonment, false arrest, and conspiracy. *Id.* ¶¶ 39–52, 67–97. Following denial of the defendants' motion for partial dismissal of the plaintiff's claims and fourteen months of discovery, the parties filed cross-motions for summary judgment, which are now ripe for resolution. *See* Pl.'s Mot. Summ. J. ("Pl.'s Mot."), ECF No. 31; Defs.' Mot. Summ. J. ("Defs.'

---

[1] Although the original and amended complaint asserted claims against "unnamed John Doe Officers 1 through 25," Compl. ¶ 5, ECF No. 1; Am. Compl. ¶ 5, following discovery, no additional MPD officers have been named as individual defendants.

Mot."), ECF No. 33.  For the reasons discussed below, the defendants are entitled to summary

judgment in their favor.

I.      **BACKGROUND**

As indicated by the pendency of cross-motions for summary judgment, the factual

matters underlying this lawsuit are not generally disputed, although the parties request different

inferences and legal conclusions to be drawn from the same facts.  The generally undisputed

facts are summarized below, followed by a brief overview of the procedural history of this

lawsuit.

In the evening of September 30, 2011, at approximately 7:00 p.m., the defendant officers

were driving in uniform and in a marked police vehicle northbound in the left lane of Minnesota

Avenue, NE, near the intersection of Dix Street, NE, in Washington, D.C.  Defs.' SMF ¶ 1, ECF

No. 33; Pl.'s Resp. Defs.' SMF ("Pl.'s Resp. SMF") ¶ 1, ECF No. 37-1.  The parties do not

dispute that this a high crime area.  Pl.'s Resp. SMF ¶ 1.  The defendant officers' police vehicle

was passed on the right side by a car, in which the plaintiff was seated in the front passenger

seat.  *Id*.  Upon noticing what they thought was a defective rear brake light on the passing car,

the defendant officers switched over to the right lane behind the car.  Defs.' SMF ¶ 1; Pl.'s Resp.

SMF ¶ 1; Defs.' Mot. Ex. B ("Lally Dep.") 24:21-22, ECF No. 33-2.

The defendant officers then observed the plaintiff looking over his shoulder and around,

including in the direction of the police car.  Pl.'s SMF ¶ 8, ECF No. 31-2; Lally Dep. at 27:14–

22 , ECF No. 33-2 (testifying that officers observed the plaintiff "look over his shoulder several

times back at the police vehicle"); Pl.'s Opp'n Def.'s Summ. J. ("Pl.'s Opp'n") Ex. B ("Connors

Dep.") at 23:11–17, ECF No. 37-3 (testifying that after police car pulled behind plaintiff's car,

the plaintiff "start[ed] exhibiting nervous behavior in the form of – he starts looking over his

shoulder, but he's looking over rapidly. And he's looking over briefly and rapidly, you know, to the point where it's almost like he's jerking his neck back, looking at us, looking forward, looking at us, looking forward.").[2]  The defendant officers further observed the plaintiff tap the shoulder of the driver and say something to him, at which time the driver came "to an abrupt stop in the middle of a highly trafficked road."  Lally Dep. at 26:15–17, ECF No. 33-2; Pl.'s SMF ¶ 10; Defs.' Resp. Pl.'s SMF ("Defs.' Resp. SMF") ¶ 10, ECF No. 39-1. The plaintiff then "made an expedient exit from the vehicle."  Lally Dep. at 27:20–22, ECF No. 33-2.  While the plaintiff contends that he had merely reached his destination, the officers perceived the plaintiff's behavior to be suspicious since his gestures appeared to reflect nervousness after noticing the police presence and he appeared to make an expeditious exit from an abruptly stopped vehicle, which the officers suspected might be an effort to flee from the police.  Defs.' Resp. SMF ¶ 9– 12; Defs.' Mot. Ex. C ("Connors Dep.") 24:22-25:17, ECF No. 33-2; Defs.' Mot. Ex. D ("Lally Interrogs.") No. 7, ECF No. 33-3; Def.'s Opp'n Pl.'s Summ. J. ("Def.'s Opp'n") Ex. B ("Lally Dep.") at 32:15–33:4, ECF No. 39-3 (testifying to his perception of "an unprovoked flight from a police officer" based on plaintiff "making eye contact with us, having the hurried conversation with the driver, almost panicking, pointing to the side of the road, getting out of the vehicle, in the quick manner, this is all indicative of someone trying to separate themselves from a police contact or police stop.").

Officer Lally then exited the police vehicle and approached the plaintiff, smelling "a strong odor of marijuana emanating from his person."  Lally Dep. at 33:12–14, ECF No. 39-3; Defs.' Resp. SMF ¶ 18.  Officer Lally verbally asked the plaintiff to stop, Defs.' Resp. SMF ¶

---

[2] Although the defendant officers were not aware at the time, a woman and a child were seated in the back seat of the car, Pl.'s SMF ¶ 8, and may have been, at least in part, a focus of the plaintiff's attention in looking over his shoulder.

16, but the plaintiff either did not stop, Defs.' SMF ¶ 3, or did not have a chance to stop, Pl.'s

Resp. SMF ¶ 3.  Regardless, Officer Lally quickly caught up with the plaintiff and handcuffed

his right hand.  Pl.'s Mot. Ex. A ("Lally Dep.") 54:1–15 ("Q:  Twenty feet away from him, you

said, hey, man, stop.  Did you start running after him?  A: No. I took . . .  a few steps.  Q: You

took a few steps. But how did you get that 20 feet covered?  A: Maybe a light jog."), ECF No.

31-3; *id.* 62:9–13; Pl.'s Resp. SMF ¶ 3. The plaintiff then shoved his left hand into the waistband

of his shorts and started struggling.  Lally Dep. at 62:9–13, ECF No. 31-3 ("I applied the—my—

using my right hand, I applied the handcuff to his right wrist. Immediately upon doing so, he

takes his left hand, shoves it into his waistband and starts struggling").[3]  The officers are aware

that when a suspect reaches into a waistband, he may be trying to retrieve a weapon, although in

this case the plaintiff was not found to be in possession of any gun was found and the plaintiff

explains that he was simply trying to pull up his shorts.  Defs.' SMF ¶¶ 3–4; Defs.' Mot. Ex. A

("Pl.'s Dep.") 62:14–20, ECF No. 33-2 ("Q: Can you think of some reason why someone might

think you're reaching into your shorts?  A: Not really, but at that time they was coming—my

shorts was coming down.  They was down.  They was off me.  Q: Were you reaching to pull

your shorts up?  A: Right. Yeah.").

    Officer Lally repeatedly yelled at the plaintiff to get on the ground, which the plaintiff did

not do.  Lally Dep. 26:2–3, ECF No. 31-3; Pl.'s Dep. 26:4–7, ECF No. 33-2.  Officer Lally then

called Officer Connors for backup.  Lally Dep. 70:7–9, ECF No. 31-3.  When the plaintiff's

---

[3] The parties provided inconsistent testimony about which of the plaintiff's hands was first handcuffed and which
arm the plaintiff resisted giving to Officer Lally.  While the plaintiff testified in his own deposition that he had been
previously shot in his right arm and, consequently, had difficulty being handcuffed with that arm, Defs.' Mot. Ex. A
("Pl.'s Dep.") 26:13-19, ECF No. 33-2, Officer Lally indicated the plaintiff resisted having his left arm handcuffed,
Lally Dep. at 62, ECF No. 31-3.  Ultimately, this inconsistency is immaterial since both parties agree that after one
hand had been handcuffed, the plaintiff shoved the other hand into his waistband and resisted having that loose-hand
cuffed.

loose arm was pulled from the waistband of his shorts, he held both his hands in fists and stood in what Officer Lally described as a "traditional fighting stance." *Id.* 70:13–20.  Around this time, Officer Lally used his metal ASP baton to hit the plaintiff's right leg, and Officer Connors performed a tactical takedown of the plaintiff in order to bring him to the ground. *Id.* 71:9–13. The plaintiff's loose arm was put into handcuffs when he was finally seated on the ground.  Pl.'s Dep. 71:9–13, ECF No. 33-2.  The parties dispute the precise amount of time that elapsed during this encounter, but the plaintiff agreed that it took no more than a few minutes.  *Id.* 28:16–20; Defs.' SMF ¶ 8.

The plaintiff explains that he resisted giving Officer Lally his loose, right arm because he suffered nerve damage in that arm due to a previous gunshot wound and, further, that he said this this during the struggle.  Pl.'s Dep. 28:3-12, ECF No. 33-2; Pl.'s Resp. SMF ¶ 6; Am. Compl. ¶¶ 13.  Indeed, Officer Lally testified that he heard the plaintiff say "I've been shot, I've been shot," but did not understand that he meant a gunshot had caused nerve damage and was the reason for resisting having handcuffs placed on his loose hand.  Lally Dep. 62:14-22, ECF No. 31-3.

After the plaintiff had been handcuffed, he allegedly told other MDP Officers that he had ingested an ecstasy pill, and was then taken to the hospital.  Lally Interrogs. No. 6; Def.'s Opp'n Ex. D ("Pl.'s Dep.") 44:3–22, ECF No. 39-5.

The plaintiff was subsequently charged with two counts of assault on a police officer ("APO") for his active resistance to arrest, one count of possession of a controlled substance, and one count of destruction of the evidence of the controlled substance due to his alleged ingestion of an ecstasy pill.  Pl.'s SMF ¶¶ 29–30.  The two controlled substance charges and one of the APO charges were voluntarily dismissed by the government and, following a bench trial, on March 9, 2012, the Superior Court dismissed the remaining APO charge.  Pl.'s Mot. Ex. F ("Tr.

Super. Ct. Hr'g") 151:21–23, ECF No. 31-8.  Noting that the government "was unable to produce the testimony of Officer Laly [sic]" due to disclosure issues, *id.* 149:14–20, the court found that "based upon the prior use of excessive force that started off this encounter, the fact that Mr. Hargraves testified that the cuff on his right hand was exceedingly tight and the injury to his right hand and the physical suffering that he would experience as a result of both hands cuffed behind them [sic], that the combination certainly of all of those factors provides a reason for me to doubt that Mr. Hargraves was not, in fact, acting without justification or excuse in simply refusing to put his left hand behind his back in order to be cuffed," *id.* 151:10–20.  Based on this finding, the court concluded that the government had not proven, "beyond a reasonable doubt that Mr. Hargraves acted without justification or excuse," when that "burden is squarely on the Government . . . ." *Id.* at 149:10–13.

The plaintiff's arrest by the defendant officers constituted a violation of a parole condition from a prior conviction and resulted in his detention for over seven months until he was cleared of the charges.  Am. Compl. ¶ 29–31.  During that time, unfortunately, the plaintiff lost his job at the Washington Hospital Center and missed the birth of his son.  *Id.* ¶¶ 32–33.

Six months after dismissal of the criminal charges, the plaintiff, on September 4, 2012, filed the instant lawsuit.  *Id.* ¶ 30.  After denial of the defendants' partial motion to dismiss the amended complaint, *see* Mem. & Order Denying Dismissal, ECF No. 12, the parties engaged in extended discovery for over a year.  *See* Minute Orders, dated March 20, 2014; June 30, 2014; July 21, 2014; September 15, 2014 (granting requests for extensions of discovery from April 15, 2014 until October 17, 2014).  Pending before the Court are the parties' cross-motions for summary judgment.  *See generally* Pl.'s Mot; Defs.' Mot.

## II.    LEGAL STANDARDS

### A.    Summary Judgment Under Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *id.* at 323, while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34 (D.C. Cir. 2015) (noting that, on summary judgment, appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party" (internal quotations and citation omitted)); *see also Greer v. Paulson,* 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (internal quotation marks omitted)); FED. R. CIV. P. 56(c) and (e)(2), (3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury," is "as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby,* 477 U.S.

at 255).  Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-51 (2000); *see also Burley v. Nat'l Passenger Rail Corp.*, No. 14-7051, 2015 WL 5464078, *1 (D.C. Cir. Sept. 18, 2015).  In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e).  If "'opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

    In cases, such as this one, involving cross-motions for summary judgment, "each side concedes that no material facts are at issue only for the purposes of its own motions."  *Sherwood v. Washington Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (citation omitted).  In other words, "[t]he fact that both parties simultaneously are arguing that there is no genuine issue of fact . . . does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." CHARLES A. WRIGHT AND ARTHUR R. MILLER, *ET AL.* 10A FED. PRAC. & PROC. CIV. § 2720 (3d Ed. 2014); *see CEI Wash. Bureau, Inc. v. U.S. Dep't of Justice*, 469 F.3d 126, 129

(D.C. Cir. 2006) (noting that cross-motions for summary judgment and absence of argument about existence of material facts "does not concede the factual assertions of the opposing motion"); *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001) (holding "summary judgment was not necessarily appropriate solely because the parties filed cross-motions for summary judgment"); *Hill v. Assocs. for Renewal in Educ., Inc.*, No. 12-823, 2014 WL 4804247 at *3 (D.D.C. Sept. 29, 2014) (same).  "Cross-motions for summary judgment are treated separately," *Shea v. Kerry*, 961 F. Supp. 2d 17, 27 (D.D.C. 2013) (citing *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982)), such that "the court must review each motion . . . on its own merits 'to determine whether either of the parties deserves judgment as a matter of law,'" *Rossignol v. Voorhaar*, 216 F.3d 516, 523 (4th Cir. 2003) (quoting *Phillip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)); *see Waterkeeper Alliance v. U.S. Coast Guard*, No. 13-289, 2014 WL 5351410, at *7 (D.D.C. Sept. 29, 2014) (same); *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (same).

## B.    Qualified Immunity

In suits brought under 42 U.S.C. § 1983, "[p]ublic officials are immune from suit . . . unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'"  *City and County of San Francisco v. Sheehan*, 135 S. Ct. at 1774 (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).  The doctrine "exists to protect officers 'from undue interference with their duties and from potentially disabling threats of liability.'"  *Lash*, 786 F.3d at 5 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).  "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments' and 'protects all but the plainly incompetent or those who knowingly violate the law.'"  *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (quoting *Ashcroft v.*

*al-Kidd*, 131 S. Ct. 2074, 2085 (2011)).  Consequently, whether qualified immunity applies

"'generally turns on the objective legal reasonableness of the [official's] action, assessed in light

of the legal rules that were clearly established at the time.'"  *Id.* at 1245 (quoting *Anderson v.

Creighton*, 483 U.S. 635, 639 (1987)).

The Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), mandated a two-step

protocol for evaluating a government officials' qualified immunity defense to a § 1983 claim.

First, the court must determine whether the plaintiff has "alleged facts showing a violation of a

constitutional right," and, second, the court must decide "whether the constitutional right was

clearly established at the time of the incident."  *Fox v. District of Columbia*, No. 14-7042, 2015

WL 4385290, at *2 (D.C. Cir. July 17, 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232

(2009)).  The test is flexible in that a court may address either of the two steps first.  *Pearson*,

555 U.S. at 242; *Fox*, 2015 WL 4385290, at *3 (same).

A right is "clearly established" if it is "sufficiently clear that every reasonable official

would have understood that what he is doing violates that right."  *Taylor v. Barkes*, 135 S. Ct.

2042, 2044 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)).  "'Ordinarily, in

order for the law to be clearly established, there must be a Supreme Court or [] Circuit decision

on point, or the clearly established weight of authority from other courts must have found the law

to be as the plaintiff maintains.'"  *Doe v. District of Columbia*, No. 13-7140, 2015 WL 4727142,

at *6 (D.C. Cir. Aug. 11, 2015) (quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)).

In other words, "existing precedent must have placed the statutory or constitutional question

beyond debate."  *al-Kidd*, 131 S. Ct. at 2083.

### III.    DISCUSSION

The plaintiff contends that the defendant officers used metal ASP batons on his body and a tactical takedown maneuver to arrest him when he "had done nothing wrong or illegal prior to being handcuffed and arrested," Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") at 8, ECF No. 31-1, thereby establishing the defendant officers' use of excessive force and wrongful stop and arrest underlying his constitutional and common law claims.  Relying on deposition testimony by MPD Sergeant George F. O'Bryant, Jr., the witness designated by the District of Columbia to testify about the MPD's procedures and standards, under FED. R. CIV. P. 30(b)(6), the plaintiff deems the District of Columbia to have "agreed" that the defendant officers had "no reasonable suspicion to stop the vehicle in which [the plaintiff] was a passenger," or to stop the plaintiff, Pl.'s SMF ¶¶ 11–15, and that these defendant officers had no "probable cause to believe that he was involved in any wrongdoing, *id.* ¶ 27.  Based on these purported concessions, the plaintiff argues that he is entitled to summary judgment in his favor on all seven of his claims, and requests a jury trial only "for the purpose of determining a damages figure." Pl.'s Mot. at 1.

Not surprisingly, the defendants vehemently dispute that Sgt. O'Bryant's testimony amounts to the concessions cited by the plaintiff and, instead, contend that the defendant officers conducted a lawful investigatory stop of the plaintiff, using an appropriate amount of force against the plaintiff, who appeared to be resisting arrest, and that the plaintiff's arrest for APO was, consequently, supported by probable cause.  Defs.' Mem. Supp. Summ. J. ("Defs.' Mem.") at 5–6, ECF No. 33.  As such, the defendants argue that the plaintiff's claims fail as a matter of law and summary judgment should be granted to the defendants.  Defs.' Mot. at 1.

As noted, the parties do not disagree about the material facts but only whether those facts and the inferences that can be drawn from them establish, as a legal conclusion, that the

defendant officers (1) had articulable reasonable suspicion when they first stopped the plaintiff and, then, had probable cause when the stop turned into an arrest; and (2) used appropriate force in making both the stop and the arrest.  In resolving the parties' dispute over the correct legal conclusions to reach from the facts presented, the Court first addresses the individual defendants' claim to qualified immunity on the plaintiff's Fourth and Fifth Amendment claims, set out in Count III, before turning to consideration of the common law claims.

### A.      FOURTH AMENDMENT CLAIM IN COUNT III

The plaintiff alleges, in Count III of the Amended Complaint, that the defendant officers are liable, under § 1983, for violating the plaintiff's Fourth Amendment rights when they unlawfully seized and arrested him and used excessive force to effectuate this stop and arrest.[4] The plaintiff argues that "the Officers had no reasonable suspicion to stop Mr. Hargraves, or probable cause to arrest him," and used excessive force with use of handcuffs and "through use of metal ASP batons[] and . . . use of tactical takedown techniques . . . ."  Pl.'s Mem. at 16.  The

---

[4] In a supplemental filing, after briefing on the cross-motions for summary judgment were completed, the plaintiff submitted a news report summarizing an analysis of nearly 2,000 incidents of APO charges in the District of Columbia from 2012 through 2014 conducted by WAMU 88.5 News and the Investigative Reporting Workshop at American University.  Pl.'s Suppl. Supp. Mot. Summ. J. and Opp'n Defs.' Mot. Summ. J ("Pl.'s Suppl. Mem.") at 4, ECF No. 42.  The news report provided statistics, which if correct are disturbing, that: (1) African-Americans account for 51% of the population, but for 90% of those charged with APO; (2) nearly two-thirds of those charged with APO were not charged with any other crime, "raising questions about whether police had justification to stop the person"; and (3) the District of Columbia charged offenders with APO three times more often than cities of comparable sizes.  Pl.'s Suppl. Mem. Ex. A ("News Report") at 3, ECF No. 42-1.  The plaintiff proffers the News Report to support holding the District of Columbia liable for the plaintiff's alleged Fourth Amendment violation because it has engaged "in a pattern or practice of violating the Fourth and Fifth Amendment rights of individuals."  Pl.'s Suppl. Mem. at 3.  Yet, the District is not named as a defendant in Count III, which clearly names only the individual defendants. Am. Compl. ¶¶ 53-66 ("This Count arises under 42 U.S.C. § 1983 and the Fourth and Fifth Amendments to the U.S. Constitution, and is alleged against by [sic] Officers Lally and Connors and John Does 1 through 25 in their individual capacities.").  Not only the Amended Complaint, but also the plaintiff's briefing discusses Count III as bearing only on the liability of the individual officers, without any reference to the liability of the District.  See Pl.'s Mem. at 14-17.  Count III makes cursory reference to the District having "a custom, pattern, and practice charging a suspect with resisting arrest and/or assaulting a police officer in order to cover up the crimes of its police officers," but this creates, at most, confusion about whether the District was intended to be named as a defendant in this count.  In any event, even if the plaintiff's supplemental filing were considered to be a constructive or clarifying amendment of the defendants named in Count III, see *Turner v. Shinseki*, 824 F. Supp. 2d 99, 122 n.23 (D.D.C.2011), the legal conclusions reached about the legality of the stop, arrest and use of force against the plaintiff would defeat the plaintiff's constitutional claim against the District.

defendants counter that the defendant officers did not violate any clearly-established right under the Fourth Amendment and, therefore, are entitled to qualified immunity under the second prong of the *Saucier* test.  Defs.' Mem. at 3, 5, 7.  This analysis turns on whether the defendant officers had reasonable suspicion sufficient to make an investigative stop and had developed sufficient probable cause to arrest the plaintiff, and used appropriate force in taking these actions.

### 1. Plaintiff's Stop and Arrest Was Lawful

Generally, "searches [and seizures] must be supported by a warrant obtainable upon a showing of probable cause," *United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005), but "[a]s an exception to the Fourth Amendment's warrant requirement, officers may conduct a brief investigative '*Terry* stop' so long as they have 'reasonable, articulable suspicion' of criminal conduct," *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (per curiam) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  While "*Terry* stops require only that officers have a 'minimal level of objective justification,'" *id.* (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)), "[t]he prohibition against unreasonable seizures requires that all seizures, even ones involving 'only a brief detention short of traditional arrest,' be founded upon reasonable, objective justification," *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

The Supreme Court made clear in *Illinois v. Wardlow,* 528 U.S. at 125*,* that police officers are justified in making a *Terry* stop where a suspect flees from the scene without any other provocation than the presence of the police, particularly in a high crime area. *See also California v. Hodari D.*, 499 U.S. 621, 624 n.1 (1991) ("That it would be unreasonable to stop, for brief inquiry, young men who scatter in panic upon the mere sighting of the police is not self-evident, and arguably contradicts proverbial common sense."); *United States v. Williams*, 816 F.

Supp. 1, 10 (D.D.C. 1993) (considering in *Terry* analysis "the fact that defendant, who was talking to someone, immediately turned around and walked away when [the officer] approached him"). In *Wardlow*, uniformed police officers drove in a marked car through an area known for heavy narcotics trafficking, which is "among the relevant contextual considerations in a *Terry* analysis," 528 U.S. at 124 , and noticed Wardlow standing next to a building "holding an opaque bag," *id.* at 122. Wardlow then "looked in the direction of the officers and fled," *id.* at 122, triggering the officers' pursuit and stop of him, at which time the officers located a loaded handgun in the suspect's bag, *id.* The Supreme Court explained that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," *id.* at 125, and found a suspect's unprovoked flight "the consummate act of evasion," *id.*, sufficient to support reasonable suspicion for a stop by the police, *id.* at 125. Acknowledging that "[h]eadlong flight" is "not necessarily indicative of wrongdoing, but it is certainly suggestive of such," the Court concluded "that the officer could detain the individuals to resolve the ambiguity." *Id.* "Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." *Id.*

In the instant case, the officers were patrolling in a marked police vehicle in a high-crime area. Defs.' SMF ¶ 1; Defs.' Mem. at 2. They observed a car with a defective brake light, and when they changed lanes to get behind that car, they saw the plaintiff look back in their direction, look around in a nervous manner, then tap the driver's shoulder with brief conversation as if requesting a stop, followed by the abrupt stop of the car in the middle of a busy street for the plaintiff's "expedient" exit from the car. Lally Dep. 27:14-22, ECF No. 33-2; Defs.' Resp. SMF ¶¶ 6-10. Given the close proximity in time between the plaintiff's apparent observation of the

police's presence, combined by the officers' observation of the plaintiff's nervousness, followed by the plaintiff's prompt exit from the car, the officers suspected that the plaintiff was attempting to flee from the officers.  The officers' perception of the plaintiff's classic unprovoked flight suggesting potential criminal conduct was corroborated when Officer Lally smelled the odor of marijuana on the plaintiff's person and asked him to stop.  Lally Dep. 33:12-14, ECF No. 39-3.  As in *Wardlow*, these circumstances support the officers' reasonable, articulable suspicion of criminal conduct when Officer Lally first asked the plaintiff to stop after his exit from the car.

The plaintiff argues that *Wardlow* is inapplicable because there "it was established that the individual did, in fact, notice the police, and upon noticing the police, took flight," when such facts are absent here.  Pl.'s Opp'n. at 8.  According to the plaintiff, the defendants were unable to establish either that the plaintiff was looking back at the police rather than the passengers in the backseat or, even if the plaintiff were looking back at the police car, that he recognized the car as belonging to the police.  *Id* at 8–9.  These arguments are to no avail.  The plaintiff is incorrect to read *Wardlow* as requiring the suspect, in fact, to have noticed the police, since the Supreme Court stated only that "[a]s the caravan passed 4035 West Van Buren, Officer Nolan observed respondent Wardlow standing next to the building holding an opaque bag.  Respondent *looked in the direction of the officers* and fled."  *Id.* at 8 (quoting *Wardlow*, 528 U.S. at 121–22) (emphasis added).  Thus, the salient fact in *Wardlow* was that the defendant "looked in the direction of the officers," not that the defendant recognized and was in fact looking at police officers.  This exactly mirrors the situation in this case.  The plaintiff does not dispute that he looked backwards *in the direction* of the officers.  Pl.'s SMF ¶ 8.  Moreover, the officers, who were in uniform in a marked police car, had a reasonable basis to believe that the plaintiff not only was looking backwards at them but that he recognized them to be police officers.

The plaintiff also contends that his exit from the car was not a flight because no stop had been conducted yet and he could not flee from officers who were not then pursuing him.  Pl.'s Opp'n at 9.  This is a misunderstanding of *Wardlow*.  The suspicious behavior recognized in *Wardlow* is precisely that the respondent fled *before* the police approached him.  *Wardlow*, 528 U.S. at 124–25.  In that case, too, the police had not yet conducted a stop but Wardlow, upon seeing the police, fled from the scene.  It is exactly the unprovoked nature of the perceived flight after seeing the police in a high crime area that was suspicious and provided the reasonable suspicion for the police to conduct an investigative stop.  This significant contextual difference distinguishes the situation from that in *Florida v. Royer*, 460 U.S. 491 (1983), which is cited by the plaintiff.  *See* Pl.'s Mem. at 16.  As the Supreme Court explained in *Wardlow*, *Royer* held that an "individual has the right to ignore the police and go about his business," when an officer approaches without reasonable suspicion, but unprovoked flight in itself may give rise to reasonable suspicion.  *Wardlow,* 528 U.S. at 125.  In this case, the nervous behavior of the plaintiff after looking in the direction of the police in a high crime area, together with his unorthodox exit from the abruptly stopped car in the middle of a busy street, provided objectively reasonable grounds for suspicion and renders the investigative stop of the plaintiff lawful.  Lally Dep. 27:14–17, ECF No. 33-2; Lally Interrogs. No. 7.

The conclusion that the defendant officers conducted a lawful *Terry* stop does not end the inquiry.  The typical *Terry* stop involves only a brief detention, without physical restraint.  Nevertheless, the use of handcuffs during a *Terry* stop does not automatically convert it into an arrest since "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The amount of force that the officers may reasonably use during a *Terry*

stop depends on the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  As the D.C. Circuit explained in *United States v. Wilson*, No. 11-0275, 1994 WL 408264, at *2 (D.C. Cir. May 5, 1994) (per curiam), if members of the police cannot use some amount of force to restrain a detainee where necessary, "*Terry* stops would be outlawed.  Defendants would simply disobey the police and run, knowing that the police would then need probable cause to chase and tackle them."

The D.C. Circuit's discussion in *United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005), of the allowable use of force during a *Terry* stop is illustrative.  The *Dykes* Court upheld the reasonableness of officers tackling a suspect, who was fleeing from the officers during a justified investigative stop.  The D.C. Circuit further explained that the officers then reasonably placed the suspect in handcuffs during the investigative stop when the suspect had kept his hands near his waistband because it was "reasonable for the officers to fear that Dykes had a weapon in his waistband, and to take the necessary steps to ensure that he could not use it." *Id.*  These facts are closely analogous to those in the instant case.  The parties do not dispute that when Officer Lally asked the plaintiff to stop, the plaintiff did not stop.  Pl.'s Resp. SMF ¶ 3.  Instead, after the officer caught up with the plaintiff, the plaintiff turned around and reached his hand into the waistband of his shorts.  Lally Dep. 45:14–18, ECF No. 33-2; Pl.'s Resp. SMF ¶ 4.  Officer Lally testified that he made the decision to place handcuffs on the plaintiff for safety reasons because Officer Lally was alone, the plaintiff was bigger, and Officer Lally thought the plaintiff might be armed based on his hand in his waistband.  Lally Dep. 54:17–55:1, ECF No. 31-3.  Courts have consistently upheld the reasonable use or show of force during investigative stops in order to

protect police officers in potentially dangerous situations.  *See, e.g.*, *United States v. White*, 648 F.2d 29, 36 (D.C. Cir. 1981) (finding that police officers drawing their guns during an automobile stop was reasonable and did not convert stop to an arrest because it "would be a little foolhardy if they approached the car at 7:30 in the evening, a car with three people in it, without their guns, at the ready"); *Cotton v. D.C.*, 541 F. Supp. 2d 195, 203 (D.D.C. 2008) (finding use of force to push the plaintiff to the ground and place her in handcuffs during an investigative stop reasonable, even though the officer had been told by bystanders that someone else had threatened the plaintiff with a knife during an altercation rather than the other way around).  Accordingly, Officer Lally's lawful investigative stop did not turn to an arrest when he handcuffed the plaintiff, who appeared to be in flight and, based upon his hand gesture to his waistband, appeared to be potentially armed.  Moreover, these circumstances bolstered the defendant officers' previous reasonable suspicion, arising from their perception of the plaintiff's nervous behavior upon seeing the police and unprovoked flight, that an investigative stop was warranted.

The parties agree that at some point during the struggle to handcuff the plaintiff, the investigative stop ripened into an arrest, for which the Fourth Amendment requires probable cause.  "Probable cause exists if a reasonable and prudent police officer would conclude from the totality of the circumstances that a crime has been or is being committed."  *United States v. Holder*, 990 F.2d 1327, 1328 (D.C. Cir. 1993); *see also Dukore v. District of Columbia*, No. 13-7150, 2015 WL 5022397, at *5 (D.C. Cir. 2015) (same); *Wesby v. District of Columbia*, 765 F.3d 13, 19 (D.C. Cir. 2014) ("An arrest is supported by probable cause if, 'at the moment the arrest was made, . . . the facts and circumstances within [the arresting officers] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect has committed or is committing a crime.") (quoting *Beck v. Ohio*, 379

U.S. 89, 91 (1964)) (alterations in original); *United States v. Washington*, 670 F.3d 1321, 1324 (D.C. Cir. 2012) (same).  Thus, for the plaintiff's arrest to be lawful, the defendant officers must have had probable cause or a reasonable good faith belief that the plaintiff committed a crime at the time the arrest took place.

Assessment of whether the officers had probable cause to make an arrest is made objectively based on the totality of the facts and circumstances that were known to the arresting officers and based on reasonably trustworthy information showing that the suspect had committed or is committing a crime.  *See Wesby*, 765 F.3d at 19.  Two undisputed facts provide probable cause in this case.  First, during Officer Lally's attempt to handcuff the plaintiff, the plaintiff refused to get down on the ground as the officer commanded and, second, refused to provide his loose arm to be handcuffed.  Lally Dep. 62:3–13, 70:1–18, ECF No. 31-3.  According to Officer Lally's testimony, the plaintiff kept his loose arm in the waistband of his shorts until the officers were able to pull it back, at which time the plaintiff's loose hand was revealed to be balled into a fist.  *Id.* at 70:14–15.  Resisting a law enforcement officer while that officer is engaged in the performance of his or her official duties qualifies as a violation of D.C. Code §22-405(b), commonly referred to as APO. [5]

The plaintiff contests that these facts support probable cause for an APO arrest.  First, he points out that resisting arrest in violation of the APO statute could not provide probable cause

---

[5]  After being handcuffed, the plaintiff allegedly told officers at the scene that he had ingested an ecstasy pill and was, consequently, taken to the hospital for medical treatment.  Pl.'s Opp'n Ex. A ("Lally Dep.") 92:20-93:2 ("Q: You wrote that Mr. Hargraves was taken to the hospital due to his ingestion of an illegal ecstasy tablet. Do you remember writing that?  A: Yes"), ECF No. 37-2.  This evidence would strongly bolster the probable cause for the plaintiff's arrest.  Indeed, the criminal charges lodged against the plaintiff included two counts for possession of ecstasy and destruction of drug evidence.  Pl.'s SMF ¶¶ 29–30.  The plaintiff disputes that he made this statement, *see* Lally Interrogs. No. 6 ("Plaintiff is reported as having ultimately told the hospital (UMC) that it was not ecstasy, but a Percocet pill that he ingested."), however.  Resolution of this dispute over whether the plaintiff admitted to swallowing ecstasy is unnecessary since, even disregarding this aspect of the evidence supporting the plaintiff's arrest, the defendant officers had probable cause to arrest him.

supporting the arrest because the plaintiff was placed in at least one handcuff before any

resistance began.  As support, the plaintiff cites the Superior Court's finding that, "[the Officers,]

in less than 10 seconds began striking him on the legs with his [metal ASP] baton[] . . . and that

**this happened prior to Mr. Hargraves even having an opportunity to resist arrest** because it

happened within seconds after the stop on the sidewalk."  Pl.'s Opp'n at 11 (quoting Tr. Super.

Ct. Hr'g 149:21-150:15) (alterations and emphasis in the original).[6]  This argument fails because,

as discussed *supra,* the initial move to place handcuffs on the plaintiff was not part of an arrest,

but rather part of a lawful investigative stop supported by reasonable suspicion.  Thus, contrary

to the premise of the plaintiff's argument, the defendant officers did not need to have probable

cause to arrest before moving to handcuff the plaintiff.  Probable cause for arrest was formed

*during* the struggle to handcuff the plaintiff's loose arm.  In other words, while the encounter

between the plaintiff and the defendant officers began as an investigative stop, this stop turned

into an arrest once the defendant officers were faced with clear resistance in conducting the

lawful stop.

Second, the plaintiff argues that efforts to handcuff the plaintiff should have stopped once

the officer discovered that the plaintiff had no weapon in his waistband.  Pl.'s Opp'n at 10.

Again, timing is important.  As discussed *supra*, the handcuffing was part of the investigative

stop.  Officer Lally acted reasonably in attempting to handcuff the plaintiff during a lawful

---

[6] Notably, unlike in this case, the Superior Court relied principally on the plaintiff's version of events in reaching its findings because the government had failed to provide Jencks material for Officer Lally.  Tr. Super. Ct. Hr'g 149:14–20 (court stating that: "I agree that in this instance because the Government was unable to produce the testimony of Officer Laly [sic], because his use of force report was not available in full and that crucial Jencks information was not available, the Court has to rely on the testimony of Mr. Hargraves as it relates to the interaction between he and Officer Laly [sic] after Officer Connors had left the scene.").  In any event, the fact that the Superior Court dismissed the APO charge against the plaintiff has little bearing on the analysis required to evaluate whether the plaintiff's stop and arrest were lawful, since the standard and burden of proof, as well as the focus of the proof, applied in that prior criminal proceeding *against* the plaintiff differ from those relevant to this civil case *brought by* the plaintiff.

investigative stop because the plaintiff was perceived to still be in flight, this officer was acting

alone against a bigger person, who had reached into his waistband indicating that he may have

been armed.  Officer Lally could not have realized that the plaintiff was unarmed until he had

secured the plaintiff with handcuffs, at which point the plaintiff was actively resisting by not

providing access to his loose arm and had balled his hands into fists, as if in "a traditional

fighting stance."  Lally Dep. 70:13–20, ECF No. 39-3.  Even though the officer may have

realized that the plaintiff was unarmed mid-struggle, he had objective reason to subdue the

plaintiff, because the plaintiff continued to appear to pose both a flight risk and a risk to the

safety of the officers and others on the public sidewalk where the struggle occurred.

Third, the plaintiff contests a finding of probable cause for his arrest because the plaintiff

was, in fact, not resisting the officers during the investigative stop but, due to an old gunshot

wound in one arm, sought to avoid any significant physical pain or discomfort from having that

arm handcuffed.  Pl.'s Opp'n at 10.  The parties do not dispute that the plaintiff tried to

communicate this old injury to the officers as a reason for not giving the officers' his loose arm,

but Officer Lally disclaims understanding the import of what the plaintiff was saying.  Defs.'

Resp. SMF ¶ 22.  The plaintiff avers that he tried to explain to the officer that he had a previous

gunshot wound in his right hand and therefore could not give him that arm because holding his

arms in a certain way caused pain.  Am. Compl. ¶ 13.  Officer Lally, on the other hand, testified

that the plaintiff merely shouted "I've been shot! I've been shot!"  Lally Dep. 62:14–22, ECF

No. 31-3.  The woman, who had been in the back seat of the car in which the plaintiff had exited,

observed the plaintiff's encounter with the police through the car window and testified at the

plaintiff's criminal hearing that the plaintiff looked like he was resisting arrest and that she

shouted to the plaintiff to stop resisting, but the plaintiff shouted back that he could not because he had been shot and cannot move his loose arm that way.  Tr. Super. Ct. Hr'g 150:18-23.

Even crediting the plaintiff's account that he tried to communicate to the officers that he could not provide his loose arm to be handcuffed due to an old gunshot wound, probable cause to arrest the plaintiff would nonetheless be present.  Assessment of reasonable suspicion is made "objectively, that is, from the perspective of a reasonable police officer."  *United States v. Thompson*, 234 F.3d 725, 729 (D.C. Cir. 2000).  From the perspective of the officers, the plaintiff tried to flee soon after he noticed the police car, Officer Lally smelled marijuana on the plaintiff, and the plaintiff refused to give up his loose arm to handcuffs and refused to get on the ground as directed but instead kept his loose hand in the waistband of his shorts and then balled up into a fist.  The officers had objective reasons to believe that the plaintiff was resisting them.

Moreover, even if the defendant officers' observations of the plaintiff's nervousness, flight and resistance to arrest were incorrect and, instead, the plaintiff was looking at the passengers in the back seat of the car coincidentally when the police car pulled behind, and he jumped out of the car to buy cigarettes, Pl.'s Mem. at 1–2, and was neither attempting to flee from the police or resist arrest, the result would be the same.  Merely because the plaintiff may have innocent explanations for each of the particular observations underlying the officers' reasonable suspicion does not defeat the lawfulness of the investigative stop.  *See Navarette v. California*, 134 S. Ct. 1683, 1691-1692 (2014) (finding possibility of innocent explanation for observed behavior does not undermine reasonable suspicion); *United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct.").

That being said, given the plaintiff's innocent explanations for his conduct, the plaintiff's encounter with the police may have had a different outcome with fewer adverse consequences for the plaintiff had the police handled the stop differently, for example, by trying to resolve their suspicions more patiently with additional questions and by exercising more restraint before resorting to any show of force.  Yet, the Supreme Court has instructed that "[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques."  *United States v. Sokolow*, 490 U.S. 1, 10–11 (1989) (rejecting respondent's argument that investigative stop was unreasonable because "the agents should have simply approached and spoken with him, rather than forcibly detaining him").  Indeed, the Supreme Court has directed courts to refrain from "indulg[ing] in unrealistic second-guessing," *id*. (internal quotations and citations omitted), of the investigative steps taken by police to dispel their reasonable suspicion and focus instead on the objective circumstances, even if the officers' perceptions turn out to be incorrect on both the law and the facts, s*ee Heien v. North Carolina*, 135 S. Ct. 530, 534, 536 (2014) (noting that "a search or seizure may be permissible even though the justification for the action includes a reasonable factual mistake… or the law turns out to be not what was thought"). These legal strictures must guide this Court's analysis.

The Court next considers the plaintiff's claim that the defendant officers used excessive force.

### 2.    *Defendant Officers Did Not Use Excessive Force During Their Stop and Arrest*

Claims based on a police officer's use of "excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [one's] person" are "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham*, 490 U. S. at 388.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight[,]" *id.* at 396, considering

such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat

to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting

to evade arrest by flight," *id.* (citations omitted).  Excessive force may be found "if 'the nature

and quality of the intrusion on the individual's Fourth Amendment interests' is weightier than the

'countervailing governmental interest at stake.'" *Rudder v. Williams*, 666 F.3d 790, 795 (D.C.

Cir. 2012) (quoting *Graham*, 490 U.S. at 396).  The Fourth Amendment is not violated, however,

by "every push or shove, even if it may later seem unnecessary in the peace of a judge's

chambers." *Graham*, 490 U.S. at 396 (citation and internal quotation marks omitted).

The plaintiff cites, as grounds for his excessive force claim, the defendant officers' use of

handcuffs, a metal ASP baton and a tactical takedown.  Am. Compl. ¶ 14, 16, 58; Pl.'s Mem. at

14–15.  Under the circumstances, the use of each of these methods was reasonable.

First, as explained *supra* Part III.A.1, the officers reasonably used handcuffs during their

investigative stop of the plaintiff because he appeared to be in flight and, by his hand gestures

(*i.e.*, loose hand in waistband and balled fist), posed a danger to others, including the officers.

Second, Officer Lally's use of his baton was reasonable.  Officer Lally used his baton twice on

the plaintiff's right leg in order to lower the plaintiff to the ground, after the plaintiff refused to

comply with the officer's commands to do so.  Lally Dep. 62:9–22; 70:13–20; 71:7–9, ECF No.

31-3.  Considering the factors described in *Graham,* the Court finds that it was reasonable for the

officer to use the baton because, from the perspective of the officer, the plaintiff, who appeared

to be actively resisting the officers, posed a significant risk to the safety of the officers and others

on the public sidewalk where the volatile struggle occurred.  Third, Officer Connors reasonably

used a tactical takedown maneuver to force the plaintiff to ground.  Officer Lally called Officer

Connors to assist in the handcuffing of plaintiff precisely because Officer Lally was struggling to do it alone given the plaintiff's resistance and refusal to comply voluntarily with verbal commands. *Id.* 70:1–71:13. At the moment that Officer Connors performed a tactical takedown to take the plaintiff to the ground, Officer Lally was still unable to handcuff the plaintiff's loose arm. *Id.* 70:7–13. The takedown may have forestalled the need for additional baton strikes since this step apparently brought the plaintiff to the ground. The escalating force used to secure the plaintiff—beginning with a command to stop, and then use of handcuffs, leading to use of a baton when resistance persisted and the plaintiff's hand gestures indicated an potential increased safety threat, and, finally, a tactical takedown—not only worked effectively, but, in a short period during a volatile struggle on a public sidewalk. This use of force was reasonable in such circumstances. *See Westfahl v. District of Columbia*, 75 F. Supp. 3d 365, 373–74 (D.D.C. 2014) (granting summary judgment based on qualified immunity to the defendant officers where officer used baton strikes and tactical takedowns to subdue the plaintiff while he was struggling with another officer in an effort to resist restraints).

The plaintiff stresses that the officers' use of force was excessive because the plaintiff had done nothing wrong. Pl.'s Opp'n at 11. Indeed, the "severity of the criminal activity at issue" is one of the factors cited in *Graham* in evaluating excessive force claims. *Graham*, 490 U.S. at 396. Yet, the nature of the criminal activity is only one of three factors, the other two being the danger posed by the plaintiff and the flight risk. In this case, the officers were suspicious that the plaintiff's actions indicated involvement in some form of criminal activity or the pendency of an outstanding warrant, Connors Dep. 23:11-17, ECF No. 33-2, and conducted the investigative stop to either allay or confirm those suspicions. The plaintiff's argument is based on the faulty premise that the officers lacked any reasonable suspicion to stop the plaintiff

and then lacked probable cause to arrest him.  To the contrary, even if the officers had no knowledge of the specific criminal activity the plaintiff may been involved in, the officers had a reasonable basis for suspicion sufficient to conduct an investigative stop and, as that encounter escalated, the officers used reasonable and escalating force to stop the plaintiff from both fleeing and resisting the officers' efforts to secure the situation.  The fact that the officers may have been mistaken in their suspicions about the plaintiff's involvement in criminal activity, such as using marijuana immediately prior to the stop, does not detract from the reasonableness of their actions based upon their observations.  As the Supreme Court explained in *Wardlow*, 528 U.S. at 126, "*Terry* accepts the risk that officers may stop innocent people.  Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent." Consequently, since the officers' stop and detention of the plaintiff was lawful, they were allowed reasonable force necessary to effectuate that stop, which they did under the circumstances presented on the record of this case.

Review of other excessive force cases resolved in favor of police officers in this jurisdiction confirms that the officers' use of force, including the use of handcuffs, batons and a tactical takedown to lower the plaintiff to the ground when he was noncompliant with commands and appeared to be resisting arrest, was not excessive.  *See*, *e.g.*, *Oberwetter v. Hillard*, 639 F.3d 545, 555–56 (D.C. Cir. 2011) (holding that excessive force was not used when officer shoved plaintiff against a pillar and twisted her arm, after she twice refused the officer's orders to stop dancing in the Jefferson Memorial, late at night in the midst of a large group of other dancers); *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009) (holding that excessive force was not used where the plaintiff was forcibly  handcuffed after refusing an officer's orders to stop);

*Jackson v. District of Columbia*, No. 13-205. 2015 WL 1211259, at *8–9 (D.D.C. Mar. 17, 2015) (granting summary judgment to defendants on plaintiff's excessive force claim, holding that no excessive force used when, after plaintiff refused to open car door, officers pulled plaintiff out of car and bent his arm to put on handcuffs, breaking the plaintiff's arm); *Westfahl*, 75 F. Supp. 3d at 373 (officer's use of baton on arrestee was not excessive force where arrestee was struggling with another officer in an "uncontrolled manner"); *Brown v. Wilhelm*, 923 F. Supp. 2d 314, 318 (D.D.C. 2013) (holding that no excessive force was used where arrestee was handcuffed after a "brief struggle"); *Armbruster v. Frost*, 962 F. Supp. 2d 105, 115 (D.D.C. 2013) (holding that no excessive force was used where arrestee was pushed onto the hood of her car, held on the ground and handcuffed after actively resisting arrest).

The plaintiff cannot establish his claim that the defendant officers used excessive force, in violation of the Fourth Amendment.  Consequently, the Court ends its inquiry without reaching the second step of the *Saucier* test, *see Hirpassa v. Albert*, 648 F. Supp. 2d 148, 151-52 (D.D.C. 2009) (ending inquiry before reaching the second step of the qualified immunity analysis because plaintiff's factual allegations could not support her claim of excessive force), and next considers the plaintiff's Fifth Amendment claim.

### B.        FIFTH AMENDMENT CLAIM IN COUNT III

In denying the defendants' partial motion to dismiss the Amended Complaint, the Court concluded that the plaintiff had sufficiently pleaded a Fifth Amendment claim in Count III against the defendant officers "premised on [these defendants'] failure to provide [the plaintiff] medical care after he was deprived of his liberty," Mem. & Order at 9, ECF No. 12, when, according to the plaintiff's allegations, "he made the arresting officers aware that he was in need of medical attention and 'at no point' did the officer provide him that care, *see* Am. Compl. ¶ 16,

including the point in time after the officers' 'affirmative act of restraining [the plaintiff's] freedom to act on his own behalf,'" *id.* (citing *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 200 (1989)).  *See also City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244 (1983) ("The Due Process Clause [] does require the responsible government or governmental agency to provide medical care to persons [] who have been injured while being apprehended by the police.").  The defendants now seek summary judgment in their favor on this aspect of the plaintiff's constitutional claim because the parties do not dispute that the plaintiff was taken to the hospital the night of his arrest.  Pl.'s Resp. SMF ¶ 11; Defs.' SMF ¶ 11.

Despite the clear record that the plaintiff was transported to the hospital after his encounter with, and arrest by, the police, he strains to support his motion for summary judgment by criticizing the reason he was taken to the hospital.  Specifically, the plaintiff argues that the officers did not dispense with their Fifth Amendment obligation to provide medical care because he was sent to the hospital as a result of his alleged admission about having ingested ecstasy rather than for treatment of his arm and leg injuries, which allegedly occurred during the struggle with the defendant officers.  Pl.'s Mem. at 17.

The plaintiff's argument is not persuasive.  Even if the plaintiff is correct that he was taken to the hospital for treatment due to ecstasy ingestion and not because of his physical altercation with the officers, this does not detract from the obvious fact that he was delivered for such medical treatment.  Moreover, contrary to the plaintiff's assertion that "nowhere in the record is it established that Mr. Hargraves was given any medical treatment for his injuries," Pl.'s Opp'n at 14, evidence in the record confirms that the plaintiff received treatment for physical abrasions appearing on his leg and arm, Pl.'s Mot. Ex. G ("MPD Final Investigative Report") (including hospital/attending physician report) at 12, ECF No. 31-9 (filed under seal).

Thus, given the uncontroverted fact that the plaintiff was sent to the hospital and treated, no reasonable jury could conclude that a violation of the plaintiff's Fifth Amendment Due Process right to medical care occurred.

Accordingly, the defendant officers, who were the only defendants named in Count III, are entitled to summary judgment on the plaintiff's claim that his Fifth Amendment were violated by an alleged failure to furnish medical attention..

### C.    COMMON LAW CLAIMS

The defendant officers are entitled to summary judgment on the only two federal claims in this suit, leaving only state common law claims against the defendants.  In this circumstance, where all federal law claims have been eliminated, the court must consider whether to exercise supplemental jurisdiction over the remaining state claims by balancing "judicial economy, convenience, fairness, and comity."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)); *see also Araya v. JP Morgan Chase Bank, N.A.*, 775 F.3d 409, 417 (2014) (finding the District Court abused its discretion by not explaining "whether or how it applied its discretion to exercise supplemental jurisdiction over the state-law claims in this case," particularly when a complaint, which was removed to this Court, "raised novel issue of state law").  Here, the plaintiff originally filed his lawsuit in this Court and the plaintiff's federal and state claims arise from a common nucleus of operative facts and overlapping legal analysis surrounding the lawfulness of the two defendant officers' investigative stop and arrest of the plaintiff and the means they used to effectuate these actions.  Discovery has been extensive and already completed, with both parties moving for cross-motions for summary judgment.  Furthermore, the issues raised here do not involve novel issues of state law.  Based on these factors, the Court finds that the interests of judicial economy,

convenience, and fairness, militate in favor of the exercise of supplemental jurisdiction over the plaintiff's remaining six common law claims.  Each of these common law claims is addressed *seriatim* below.

### 1.     Battery Claim in Count 1

The plaintiff and defendants seek summary judgment in their favor on Count I of the Amended Complaint alleging that the individual defendant officers are liable for common law battery because they used excessive force to effectuate the plaintiff's stop and subsequent arrest, and that the District of Columbia is likewise liable for the actions of its officers-employees under the theory of *respondeat superior*.  Pl.'s Mem. at 7.

Under District of Columbia law, a battery is "an intentional act that causes a harmful or offensive bodily contact."  *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (quoting *Etheredge v. District of Columbia*, 635 A.2 908, 916 (D.C. 1993) (quotations omitted). At the same time, "District law provides a government actor with a privilege defense to such tort claims when '(1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable.'"  *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) (quoting *Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012) (citations and alterations omitted) and citing *Marshall v. District of Columbia*, 391 A.2d 1374, 1380-81 (D.C. 1978)); *see also Smith v. District of Columbia*, 882 A.2d 778, 787-88 (D.C. 2005) (in evaluating an assault and battery claim involving allegations of excessive force by police officers, "the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged"); *Etheredge*, 635 A.2d at 916 (noting undisputed facts "that Officer [] assaulted and battered [plaintiff] when he shot him," but that "the question is whether, under the circumstances [the officer] had the legal right to do so," since "[a] police officer has a qualified privilege to use

reasonable force to effect an arrest, provided that the means employed are not "in excess of those which the actor reasonably believes to be necessary.") (internal quotations and citations omitted).

While the analysis of qualified immunity for both an excessive force claim under Section 1983 and the privileged use of force defense to a common law assault and battery claim implicate similar "realistic" concerns about "the perils of police work," *Etheredge*, 635 A.2d at 916 n.10, the D.C. Court of Appeals has recognized "that there are differences between a federal constitutional claim and a tort suit brought under District of Columbia law," *id.*; *see also Enders v. District of Columbia*, 4 A.3d 457, 465 n.11 (D.C. 2010) (noting that "a judgment in favor of the defendant [under 42 U.S.C. § 1983] is not necessarily controlling on liability under a common law cause of action"); *Scales v. District of Columbia*, 973 A.2d 722, 73 n.5 (D.C. 2009) (noting that "qualified immunity from § 1983 does not preclude a suit based on … any other state law tort"). By comparison to the "more onerous" objective qualified immunity test under § 1983, *Etheredge*, 635 A.2d at 916 n.10, "the test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation," *Scale*s, 973 A.2d at 730. In light of the officers' testimony regarding their good faith belief regarding the use of force employed, Lally Dep. 54:17–55:1 & 70:13–20 & 71:5–13, ECF No. 33-3; Connors Dep. 48:1–7, ECF No. 37-3, and the discussion, *supra* Part III.A.2, that the defendant officers are entitled to qualified immunity, under § 1983, due to their use of a reasonable, rather than an excessive, amount of force in the circumstances, their actions were privileged and the plaintiff is not entitled to relief on this claim.

Nevertheless, the plaintiff cites three pieces of evidence to support his claim that the conduct of the defendant officers is not subject to privilege and that he is entitled to recover on his assault claim: (1) "the Officers were required to start at the lowest level of the Use of Force Continuum [but instead] the Officers bypassed multiple steps and proceeded to use their ASP batons and a tactical takedown, rather than attempt to verbally persuade Mr. Hargraves to comply;" Pl.'s Mem. at 8;  (2) the plaintiff's expert consultant, Wendell France, opines that the officers' conduct was "extremely over-reaching," *id.* at 9; and (3) the District's own witness, designated under Rule 30(b)(6), testified that officers were "not permitted" to make an investigative stop or to handcuff the plaintiff, *id.* at 8.  None of these evidentiary items is persuasive.

First, the plaintiff mischaracterizes MPD policy regarding the Use of Force Continuum as requiring the defendant officers to start at the lowest level of force on the continuum.  To the contrary, MPD General Order 901.07 expressly states that "Members are *not required* to start at the lowest level of options listed in the Use of Force Continuum.  Members should select the *appropriate* level of force based on what a *reasonable* member and the circumstances require."  Pl.'s Mot. Ex. H ("Consultant Report") at 8 (quoting MPD General Order 901.07), ECF No. 31-10 (emphasis supplied).  Thus, the defendant officers do not appear to have violated the MPD policy cited by the plaintiff.  In any event, the officers reasonably used a continuum of force, beginning with a verbal command to stop, then use of handcuffs on a suspect perceived to be in flight, followed by use of a baton and takedown maneuver, when the suspect failed to comply and continued struggling.

Second, the plaintiff relies on his expert consultant's conclusion that the conduct was extremely over-reaching.  While expert testimony regarding whether an officer acted "outside

the scope of accepted police practice in the United States and outside the D.C. Metropolitan Police Department policy governing use of force" may be useful in the assessment of excessive force, *McKnight v. District of Columbia*, No. 00-2607, 2006 WL 6904002, at *2 (D.D.C. Jan. 17, 2006), the expert report submitted by the plaintiff is not helpful since it is based on incorrect or incomplete premises.  For example, in reaching his conclusion that the officers' conduct in this case was "extremely over-reaching and [] entirely inconsistent with acceptable police practices, as well as MPD training and policy standards," the plaintiff's proffered expert appears to have omitted crucial observations corroborated by the plaintiff, such as the plaintiff's refusal to provide his loose arm to be handcuffed and to sit on the ground when commanded to do so by the officer, and the plaintiff's placement of his loose hand into the waistband of his shorts, which was reasonably perceived as a potential reach for a firearm by the officer.  *See generally* Consultant Report.  The proffered expert's failure to address these salient factual circumstances leaves a gaping hole in his conclusions.  Likewise, when discussing the defendant officers' use of force, the plaintiff's proffered expert based his finding of excessive force on the faulty premise that the officers lacked reasonable suspicion to effect a stop, a conclusion which the Court has found to be incorrect.[7]  These significant deficiencies are such that the proffered expert's opinion fails to create any genuine dispute of material fact sufficient for any reasonable juror to conclude that the defendant officers' use of force was not privileged.  *See Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 672 (D.C. Cir. 1977) (upholding summary judgment where the expert did not substantiate his opinion with evidence in the record); *Wannall v. Honeywell*

---

[7] The plaintiff's proffered expert opines that Officer Lally was either inadequately trained regarding, or willfully disregarded, established principals of Fourth Amendment law based on this officer's testimony that "suspicious activity coupled with unprovoked flight in a high crime area" would establish reasonable suspicion for a *Terry* stop. Consultant Report at 11.  Officer Lally's understanding, however, is consistent with the Supreme Court's ruling in *Wardlow*, where suspicious activity coupled with unprovoked flight in a high crime area were found sufficient to create reasonable suspicion for the officers to effect a *Terry* stop.  *Wardlow*, 528 U.S. at 124–25.

*Intern. Inc.*, 292 F.R.D. 26, 38 (D.D.C. 2013) (finding that expert testimony is insufficient to create a genuine issue of material fact where it is "an opinion about a counterfactual, hypothetical situation not present in the case").

Finally, the plaintiff's heavy reliance on the testimony of the District's 30(b)(6) witness, is misplaced.  The plaintiff asserts that the District admitted that the officers wrongfully stopped him based on Sgt. O'Bryant's testimony that the plaintiff did not do anything "wrong" when he walked away from "a contact."  Pl.'s Opp'n at 14 (quoting Ex. C ("30(b)(6) Dep.") 70:14–71:4, ECF No. 37-4); *see also id.* at 9–10, 15.  The testimony of Sgt. O'Bryant was in response to the plaintiff's counsel's hypothetical questions that did not fully incorporate the "totality of the circumstances" confronting the defendant officers in this case, and framed the context, incorrectly, as officers making a "contact," rather than an investigative stop, which is what occurred in this case.  In short, examination of the testimony at issue makes clear that Sgt. O'Bryant was asked about a different set of circumstances than the facts presented in this case. *See* 30(b)(6) Dep. 28:10–30:3 ("Q: So do you recall the previous example that we were talking about in which the two cars had coincidentally pulled over and the cops had maybe intended to make a traffic stop, but hadn't yet activated their lights or sirens and then the individual sprinted away from the car? . . . Are you intending to say that the officer, who didn't have reasonable suspicion to conduct the traffic stop, could attempt to make contact with that individual or stop him by sheer fact of him sprinting away from the car? . . . A: You could make a contact.").  The facts of the hypothetical lacks crucial facts presented in this case such as the plaintiff acting nervously and looking in the direction of the police before abruptly exiting the car in the middle of a street in a high-crime neighborhood.  The District made no "admission" via its 30(b)(6) designee that applied to the facts in this case.

The evidence relied upon by the plaintiff to show that the defendant officers' belief that they needed to use force against the plaintiff was unreasonable falls short.  Instead, the force used by the defendant officers was privileged, defeating the plaintiff's battery claim.  Since the defendant officers did not commit battery against the plaintiff, the District of Columbia cannot be liable under the doctrine of *respondeat superior*.  Accordingly, all defendants are entitled to summary judgment on Count I.

### 2.    *Intentional Infliction of Emotional Distress Claim in Count II*

The plaintiff's next common law claim is that the defendant officers and the District are liable for the intentional infliction of emotional distress ("IIED").  Am. Compl. ¶¶ 47–52. The plaintiff alleges that his unlawful stop and arrest, along with the alleged excessive use of an ASP baton and tactical takedown to force him to the ground, amounted to extreme and outrageous conduct that caused him to suffer severe emotional distress.[8]  Pl.'s Mem. at 10–11.  The defendants counter the plaintiff's argument for summary judgment on this claim, by contending that, since the officers had probable cause for the plaintiff's arrest and used appropriate force to both stop and arrest the plaintiff, they are entitled to summary judgment in their favor.  Defs.' Mem. at 14–15. The defendants are correct.

To prevail on an IIED claim under District of Columbia law, the plaintiff must show: "'(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" *Amobi v. D.C. Dep't of Corr.,* 755 F.3d 980, 995 (D.C. Cir. 2014) (quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d

---

[8] The Amended Complaint also alleges that the plaintiff suffered IIED due to the defendant officers' filing false charges in order to protect themselves from civil and criminal liability, *see* Am. Compl. ¶ 49, but no party mentions this allegation in their respective cross-motions for summary judgment or presents any evidence regarding the alleged falsification of the APO charge.  Indeed, the plaintiff conceded during his deposition testimony that he did not comply with the officers' commands to get on the ground, which may suffice to support an APO charge.  *See* D.C. Code § 22-495(b).

793, 808 (D.C. 2003)); *see also Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 188

(D.D.C. 1997) (citing *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 935 (D.C. 1995)). This

common law claim has been described as "a very narrow tort with requirements that 'are

rigorous, and difficult to satisfy.'"  *Snyder v. Phelps*, 562 U.S. 443, 464-65 (2011) (Alito, J.,

dissenting) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON

LAW OF TORTS § 12, p. 61 (5th ed. 1984)); *see also Drejza v. Vaccaro*, 650 A.2d 1308, 1312

(D.C. 1994) (noting that the standard is "not an easy one to meet").  Indeed, with respect to the

first element, the D.C. Circuit has explained that the "conduct alleged must be 'so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency and to be

regarded as atrocious, and utterly intolerable in a civilized community.'" *Amobi,* 755 F.3d at 995

(quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991*); see also Baltimore v.

District of Columbia*, 10 A.3d 1141, 1155 (D.C. 2011).

Moreover, merely suffering from mental anguish and stress is insufficient to meet the

third element, which instead requires "the level of severe emotional distress," which is "so acute

. . . that harmful physical consequences [are likely] to result." *Futrell*, 816 A. 2d at 808 (internal

quotations and citations omitted; brackets in original).  "'Where reasonable persons may differ, it

is for the jury, subject to the control of the court, to determine whether, in the particular case, the

conduct has been sufficiently extreme and outrageous to result in liability.'" *Amobi,* 755 F.3d at

995 (quoting *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998)); *see also Abourezk v. New York

Airlines, Inc.*, 895 F.2d 1456, 1458 (D.C. Cir. 1990) (same).

The Court finds that no reasonable juror could view the defendant officers' use of force

under the circumstances presented here, which involved a volatile struggle on a public sidewalk

with a suspect whom the officers had reason to believe was in flight, was non-compliant with

commands, and had been using marijuana, as so outrageous in nature as to go beyond all possible bounds of decency. To the contrary, the defendant officers' use of force in this case is well within the realm of conduct that courts have found to not rise to the level of extreme and outrageous. *See Harris v. District of Columbia*, 696 F. Supp. 2d 123, 137 (D.D.C. 2010) (dismissing the plaintiff's intentional infliction of emotional distress claim because the alleged conduct was not extreme and outrageous, where the plaintiff alleged that he was arrested without a warrant, and that 12 officers used excessive force when they performed the search with their guns drawn); *Stevens v. Stover*, 727 F. Supp. 668, 672-73 (D.D.C. 1990) (finding that the defendant officer's use of force to effectuate the arrest of the resisting plaintiff "[did] not rise to the level of extreme and outrageous conduct required for a claim of intentional infliction of emotional distress as the [c]ourt has already found that the degree of force that [the arresting officer] employed in arresting plaintiff was reasonable in view of plaintiff's resisting arrest"); *Smith*, 882 A.2d at 794 (affirming the trial court's order granting judgment as a matter of law on the plaintiff's intentional infliction of emotional distress claim where the defendant used an illegal chokehold on the plaintiff in order to break up a fight between the plaintiff and a third party).

The Court finds that the defendant officers' use of force does not rise to the level of extreme and outrageous conduct required to establish an IIED claim and, therefore, the plaintiff is unable to satisfy the first element of his IIED claim.[9] Accordingly, the defendants are entitled to summary judgment on Count II.

---

[9] The cases cited by the plaintiff do not support a contrary conclusion. First, the plaintiff points to three cases, in which summary judgment was granted to defendants on the plaintiff's IIED claim where comparatively lesser force was used than against the plaintiff here, Pl.'s Mem. at 11–12 (citing *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 66–68 (D.D.C. 2014); *Martin v. City of Philadelphia,* No. Civ.A. 99-543, 2000 WL 1052150, at *16 (E.D. Pa. July 24, 2000) and *Eres v. Cnty. Of Alameda*, No. C-96-2094, 1999 WL 66519, at *12 (N.D. Cal. Feb. 1, 1999)), but in none those cases was the plaintiff apparently physically resisting the officers' arrests. Second, the plaintiff's reliance on three other cases is inapposite since those cases involved significant disputes of material fact. *See* Pl.'s

### 3    Negligent Supervision and Negligent Infliction of Emotional Distress Claims in Counts IV and V, Respectively

The plaintiff's negligent supervision and negligent infliction of emotional distress claims, in Counts IV and V, respectively, against the defendant officers are predicated on the same factual allegations and will be analyzed together, before turning to the plaintiff's negligence claims against the District.

Even if the plaintiff is unable to show that the defendant officers violated his constitutional rights, the defendants could still be liable for negligence. *Scale*s, 973 A.2d at 731. In order to prevail on a negligence cause of action, the plaintiff must prove, using expert testimony on the standard of care, "'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Hill v. Metropolitan African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001) (quoting *Levy v. Schnabel Found. Co.*, 584 A.2d 1251, 1255 (D.C. 1991)); *see also Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir. 2001) ("Under District of Columbia law, '[t]he plaintiff in a negligence action bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the plaintiff's injury.'") (quoting *Toy v. District of Columbia*, 549

---

Mem. at 12 (citing *Brooks v. District Of Columbia*, No. 05-362, 2006 WL3361521 (D.D.C. Nov. 20, 2006) and *Lancaster v. Cox*, No. 10-3064, 2013 WL 1624453 (C.D. Ill. Apr. 15, 2013)); Pl.'s Opp'n at 17 (citing *Amons v. District Of Columbia*, 231 F. Supp.2d 109 (D.D.C. 2002)). For example, in *Brooks,* the parties offered divergent accounts of the circumstances surrounding the plaintiff's arrest: the plaintiff said the police officers arrested and beat him without provocation, while the defendants said the use of force was necessary because the plaintiff failed to comply with the officers' request to stop and pushed an officer. 2006 WL 3361521, at * 1. Given the irreconcilable versions of what occurred, whether the defendant officers' actions were justified remained unclear, precluding the grant of summary judgment to the defendants. *Id.* at *2–3. Similarly, in *Lancaster,* summary judgment on the plaintiff's IIED claim was denied due to genuine issues of material fact remaining as to whether the defendant officer used excessive force against the plaintiff. 2013 WL 1624453, at *8. Finally, in *Amons,* summary judgment was denied because there was "insufficient information in the record to determine whether there was probable cause to arrest" or to resolve the plaintiff's allegations that the arresting officer shot and killed his pet and allowed his property to be stolen. 231 F. Supp.2d at 118. By contrast, no such genuine issue of material fact is present here as to whether the defendant officers used excessive force against the plaintiff. *See supra* Part III.A.2.

A.2d 1, 6 (D.C. 1988).  The plaintiff fails to present sufficient evidence in support of his negligence claims to go to a jury.

### (a)      Liability of Defendant Officers

As support for his negligence claims against the individual officers, the plaintiff alleges that each officer negligently supervised the other and failed to intervene when his fellow officer allegedly violated MPD rules.  *See* Pl.'s Opp'n at 19 ("Mr. Hargraves's negligence claims are premised on, *inter alia*, an MPD Officer's duty to intervene and prevent other officers from violating MPD rules and/or orders—not use of force.").  Specifically, the plaintiff points to MPD Special Order 97-31, titled "Code of Ethics," which establishes a duty for each individual officer to conduct him or herself in an ethical way, and MPD General Order 201.26, titled "Duties, Responsibilities and Conduct of Members of the Department," which establishes a duty for each officer to *report* any violations of the rules of the MPD by any other members of the MPD.  Pl.'s Mem. at 18–19.  Although neither rule appears to impose a duty on MPD officers to intervene actively to stop MPD rule violations by fellow officers, the flaw in the plaintiff's claims is more fundamental.  Even if the cited MPD Special Orders, or other rules, imposed such a duty on the defendant officers, the record does not reflect that either defendant officer engaged in improper or unlawful conduct warranting any intervention.  In other words, even assuming, *arguendo*, that the MPD Special Orders cited by the plaintiff, or other such orders, provide an applicable standard of care, the officers' conduct in stopping and arresting the plaintiff were lawful and the force used to effectuate these actions was not excessive, and, thus, assisting, rather than intervening to stop, this conduct did not amount to any deviation from the standard of care by either defendant officer. [10]

---

[10] The defendants present two additional arguments for granting judgment in their favor on the plaintiff's negligence claims. The defendants contend, first, that the plaintiff's proffered expert fails to establish a national standard of care

Accordingly, the Court grants summary judgment to the defendant officers on Counts IV and V.

### (b)   District of Columbia Liability

The plaintiff asserts two theories to hold the District liable for negligence: first, under the doctrine of *respondeat superior*, *see* Pl.'s Mem. at 20, 22; and, second, due to faulty orders and enforcement of regulations, *id*.  The first theory of liability fails because the Court has concluded that the defendant officers did not engage in tortious conduct.  Consequently, the District of Columbia cannot be liable to the plaintiff under the doctrine of *respondeat superior.*

The second theory of liability stems from the plaintiff's allegations that the District is independently liable under Count IV for negligent supervision as a result of "'[1] giving improper or ambiguous orders or [2] in failing to make proper regulations' and/or [3] 'for permitting . . . negligent or other tortious conduct by [the Officers] . . . with instrumentalities under his control.'"  Pl.'s Mem. at 20 (quoting *Linares v. Jones*, 551 F. Supp. 2d 12, 19 (D.D.C. 2008) (alterations in the original).

The plaintiff's evidence that the District gave improper or ambiguous orders is that the District, in an investigation of the plaintiff's case, found that the defendant officers acted within their authority, when Sgt. O'Bryant, in his capacity as the District's 30(b)(6) witness, purportedly admitted that "the Officers were not permitted to stop, use force on, handcuff or arrest Mr. Hargraves because he had done nothing wrong," *id.*, creating an obvious contradiction.  As discussed, *supra* Part III.C.1, the plaintiff mischaracterizes the portions of Sgt. O'Bryant's

---

by citing solely to MPD rules, Defs.' Mem. at 16; and, second, that the plaintiff's negligence claims "are not separate and distinct from plaintiff's excessive force and battery claims," *id.* at 17, as required under District law, *see District of Columbia v. Chinn*, 839 A.2d 701, 711 (D.C. 2003) ("in a case involving the intentional use of force by police officers, [if] a negligence count is to be submitted to a jury, that negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force and violative of a distinct standard of care"); *Scales*, 973 A.2d at 730–31 (same).  The Court need not address these arguments since the plaintiff's negligence claims are resolved on alternative grounds.

testimony containing responses to plaintiff's counsel's hypotheticals, which did not capture the totality of the circumstances confronting the defendant officers during their encounter with the plaintiff.  Without any shred of evidence that the District actually gave out ambiguous or improper orders, the plaintiff cannot establish this allegation, let alone prevail on his negligence claims against the District on this basis.

The plaintiff also alleges that the District permitted the negligent and tortious conduct of the defendant officers "by failing to reprimand or terminate the Officers for their conduct in stopping, using force on, handcuffing, and arresting Mr. Hargraves[.]"  Pl.'s Mem. at 20–21.  Since the defendant officers' conduct was lawful, the premise of this allegation is flawed and, consequently, cannot support the plaintiff's negligence claim against the District.

Accordingly, the Court grants summary judgment to the District on Counts IV and V.

### 4.  *False Arrest and False Imprisonment in Count VI*

The plaintiff alleges, in Count VI, that the defendant officers falsely arrested and imprisoned the plaintiff, resulting in his incarceration for almost eight months since his arrest triggered a violation of his parole conditions stemming from a prior conviction, Am. Compl. ¶¶ 85–92, and that the District of Columbia is liable for this claim based on the doctrine of *respondeat superior,* Pl.'s Mem. at 23.  Under District of Columbia law, police officers are entitled to immunity from false arrest and false imprisonment claims by establishing either of "two affirmative defenses (which are distinct from 'qualified privilege')," *Scales*, 973 A.2d at 729: (1) that the officers had probable cause for the arrest "based entirely on the objective facts and in this context," *id.;* and (2) a "'usually easier-to-meet,'" so-called "partially subjective test" that the officer "believed, in good faith, that his [or her] conduct was lawful, and [] this belief was reasonable," *id.* (first alteration in original) (quoting *District of Columbia v. Murphy*, 635

A.2d 929, 932 (D.C. 1993)); *see also Dukore,* 970 F. Supp. 2d at 33 (recognizing that officers'

actions are privileged as justified by "showing that there was probable for arrest of the plaintiff

on the grounds charged," or "[a] lesser showing …that the officer acted in good faith"); *Pointer*

*v. District of Columbia*, 736 F. Supp. 2d 2, 9 (D.D.C. 2010) (noting that, under District law,

police officers' actions are privileged even if they lacked probable cause, as long as "the

defendant officers had merely a reasonable, good faith belief that probable cause existed")

(quoting *Liser v. Smith*, 254 F. Supp. 2d 89, 98 (D.D.C. 2003)).  The District "must affirmatively

rely on" the partially subjective test for this defense to apply, *Scales*, 973 A.2d at 729, and

where, as here, the District has not done so, "the objective 'probable cause' test applies," *id*.

(citing *Karriem v. District of Columbia*, 717 A.2d 317, 320 n.8 (D.C. 1998)).

The D.C. Court of Appeals has made clear that the tort of false arrest and its defenses at

common law are "indistinguishable as a practical matter from the common law tort of 'false

imprisonment,'" since the "gravamen of a complaint for false arrest or false imprisonment is an

unlawful detention." *Bradshaw*, 43 A.3d at 322 n.7 (quoting *Enders*, 4 A.3d at 461); *see also*

*Rice v. District of Columbia*, 774 F. Supp. 2d 18, 21 (D.C. 2011) (noting that "practically

identical" analysis used for false arrest and false imprisonment).  The "central issue" in

evaluating claims for both false arrest and false imprisonment "'is whether the arresting officer

was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting office is

privileged and the action fails.'" *Bradshaw*, 43 A.3d at 323 (quoting *Scott v. District of*

*Columbia*, 493 A.2d 319, 321 (D.C. 1985)).

The Court has already found that the defendant officers, objectively, had reasonable

suspicion to support the initial investigative stop of the plaintiff and, further, that during the

struggle to handcuff the plaintiff, who was not following police commands, the defendant

officers developed probable cause for arrest.[11]  *See supra* Part III.A.1. Therefore, the plaintiff's

claims for false arrest and false imprisonment fail as a matter of law.  *See Scales*, 973 A.2d at

729 (rejecting plaintiff's argument that officer "had 'no probable cause to arrest him,'" and

finding, instead, that probable cause was present and "suit for false arrest was barred as a matter

of law").  Since the defendant officers are not liable, neither can their employer, the District of

Columbia, be held liable for false imprisonment and false arrest under the doctrine of *respondeat*

*superior.  Id.* at 728.  Accordingly, the Court grants summary judgment to all defendants on

Count VI for false arrest and false imprisonment.

### 5.  Conspiracy Claim in Count VII

The plaintiff's last claim, in Count VII, is that the defendant officers engaged in a

conspiracy to commit the underlying torts of false arrest and imprisonment, battery and IIED,

Am. Comp. ¶¶ 95-97, and that the District is also liable under the doctrine of *respondeat*

*superior,*  Pl. Mem. at 28.  The defendants argue that because "Plaintiff is not entitled to

judgment on his tort claims, he is also not entitled to judgment on his conspiracy claim."  Defs.'

Opp'n at 14. The defendants are correct.

The law "is widely accepted" that a plaintiff may bring suit "for civil conspiracy only if

he ha[s] been injured by an act that was itself tortious."  *Beck v. Prupis,* 529 U.S. 494, 501

(2000) (citing 4 RESTATEMENT (SECOND) OF TORTS § 876, Comment b (1977) ("The mere

common plan, design or even express agreement is not enough for liability in itself, and there

must be acts of a tortious character in carrying it into execution"); W. Prosser, LAW OF TORTS §

---

[11] To the extent that the plaintiff relies on the purported "admission" by the District's 30(b)(6) witness to support
this claim and argue that probable cause for the arrest was lacking, Pl.'s Opp'n at 15, the Court has already rejected
this interpretation of the witness' testimony, for the reasons discussed, *supra* in Part III.C.1, and is not persuaded
that this testimony creates any material factual disputes to defeat summary judgment on this claim, let alone to
warrant judgment in the plaintiff's favor.

46, p. 293 (4th ed. 1971) ("It is only where means are employed, or purposes are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable")).  Thus, a civil conspiracy claim requires the "performance of some underlying tortious act." *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) (quoting *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)). "Consistent with this principle," the Supreme Court has observed that "a conspiracy claim was not an independent cause of action, but was only the mechanism for subjecting co-conspirators to liability when one of their member committed a tortious act." *Beck*, 529 U.S. at 503; *see also Nader v. Democratic Nat'l Committee*, 567 F.3d 692, 697 (D.C. Cir. 2009) (stating that "'[c]ivil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort'" (brackets in original)(quoting *Hill v. Medlantic Health Care Group*, 933 A. 2d 314, 334 (D.C. 2007)); *Halberstam*, 705 F.2d at 479 (stating that civil conspiracy requires "an overt tortious act in furtherance of the agreement that causes injury . . . . Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort").  Consequently, to establish a civil conspiracy claim, the plaintiff must adequately show an underlying tort and the following elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to an din furtherance of the common scheme." *Halberstam*, 705 F.2d at 477.

        In light of the findings that, as a matter of law, the defendant officers are not liable to the plaintiff for false arrest and imprisonment, battery and IIED, no other underlying tort exists that

the defendant officers could have conspired to commit.  The plaintiff's civil conspiracy claim

therefore lacks a critical prerequisite. [12]  *See Executive Sandwich Shoppe, Inc.*, 749 A.2d at 738

(finding that "civil conspiracy claim premised on" a rejected "tort theory fails as a matter of law

for lack of an underlying tortious act.").  Accordingly, the Court grants summary judgment to the

defendants on Count VII.

## IV.    Conclusion

Despite the unfortunate confluence of events that led to the plaintiff's encounter with the

police, on September 30, 2011, and his arrest on charges, which led to no conviction but his

incarceration nonetheless for almost eight months, his efforts to hold the individual police

officers and the District of Columbia civilly liable are unavailing.  The plaintiff has attested to

the pain and suffering he "went through" as a result of this interaction with the police, including

"I couldn't see my son born. I wasn't able to continue my job."  Pl.'s Mot. Ex. D ("Pl. Dep.")

56:14–17, ECF No. 31-6.  Yet, not every injury is compensable or is the result of unlawful

conduct.  In this case, the undisputed factual record establishes that the defendant officers'

actions were defensible and reasonable under the circumstances.

Accordingly, the defendants' motion for summary judgment on all claims against them is

granted and the plaintiff's cross-motion for summary judgment is denied.

An order consistent with this Memorandum Opinion will issue contemporaneously.

---

[12] The defendants make an additional argument against the legal viability of the plaintiff's conspiracy claim, namely, that, under the intracorporate conspiracy doctrine, the defendant officers, "when acting in the scope of their employment, cannot conspire among themselves." Defs.' Opp'n at 15 & Defs.' Mem. at 19 (quoting *Executive Sandwich Shoppe, Inc.*, 749 A.2d at 739 (without resolving issue, D.C. Court of Appeals remanded case for consideration of "the applicability of the intracorporate conspiracy doctrine to civil conspiracy claims")).  The plaintiff concedes this point, indicating that the conspiracy claim "is sound" if "this Court were to conclude that the Officers were not acting within the scope of their employment with the District," rendering the intracorporate conspiracy doctrine inapplicable. Pl.'s Reply Supp. Mot. Summ. J. ("Pl.'s Reply") at 12, ECF No. 40.  Since the Court finds undisputed that the defendant officers were clearly acting within the scope of their employment, the plaintiff's civil conspiracy claim fails, as conceded, on this ground.

Dated: September 22, 2015

_____
BERYL A. HOWELL
United States District Judge